UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CUMMINS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:09-cv-00738-JMS-DML |
| | ) | |
| ACE AMERICAN INSURANCE | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

# Order on Plaintiff's Motion to Compel Answers
## to Interrogatories and Production of Documents

This matter is before the court on the motion (Dkt. 87) by plaintiff Cummins, Inc. to

compel the 13 defendant insurance companies ("Insurers") to answer certain interrogatories and

produce certain documents requested by Cummins in its First Set of Interrogatories and First Set

of Production Requests. The motion is granted in part and denied in part as follows.

This case concerns insurance coverage to Cummins for losses from a severe flood in

Columbus, Indiana in June 2008 that affected four sites within Cummins's corporate campus:

the Cummins Occupational Health Center (COHC) site; the Cummins Child Development

Center (CCDC) site; the Cummins Technical Center (CTC) site; and the Cummins Engine Plant

No. 1 (CEP) site.  Cummins contends it has suffered more than $200 million in losses from the

flood.  The defendants are 13 insurance companies that provided coverage to Cummins for the

period August 1, 2007 through August 1, 2008, pursuant to the terms of one or more

"manuscript" insurance policies, which apparently are materially identical, and which were

"shopped" to the Insurers by Cummins's insurance broker (hereafter, the "Policy").[1]  The latest information from the Insurers is that Cummins has been paid $91,948,824 to date on the claims it has submitted to its Insurers ("Claim").

The pleadings and other filings in this case indicate that the parties' insurance coverage disputes center primarily around the following issues:

1.      The meaning and application of the term "Flood in High Hazard (100 year) Flood Zones," to which a $50,000,000 sublimit applies.  Endorsement No. 10 to the Policy defines "High Hazard Zones for Flood" as:

a)  all property at a "location" that is partially or totally situated in an area which at the time of loss or damage has been designated on a Flood Insurance Rate Map (FIRM) to be a Special Flood Hazard Area (SFHA), and/or
b)  all property in areas where the National Flood Insurance Program (NFIP) is not in effect, and where all property at a "location" is partially or totally situated in an area which is within a 100 year flood plain or its worldwide equivalent, and/or
c)  all property at a "location" that is partially or totally protected by dams, dikes, levees or walls which were intended to protect such property from the level of a 100 year flood or its worldwide equivalent, regardless of any Zone or Area designation or assignment by FIMA or other recognized authority having jurisdiction.

The Insurers contend that because the Cummins Technology Center and Cummins Child Development Center are at least partially situated in areas described in Endorsement No. 10, then losses at the CTC and CCDC are subject to a $50,000,000 sublimit.  Cummins questions the application of Endorsement No. 10 and, even if it applies, contests that all losses at CTC and CCDC are subject to a $50,000,000 sublimit.

---

[1]      Eleven of the defendant insurance companies had filed a declaratory judgment action regarding coverage.  The declaratory judgment case (transferred to this district and assigned case no. 1:09-cv-1133-LJM-DML) was ordered consolidated with this action for all purposes by order entered April 27, 2010 (Dkt. 43), and was later dismissed because the insurance coverage issues raised in the Insurers' complaint for declaratory judgment were within the claims, counterclaims, and defenses in Cummins's suit.  (Dkt. 85).

2. The parties also disagree whether coverage for "Extra Expense and Expediting Expenses" and "Research and Development" are subject to the $50 million high hazard flood sublimits. The Insurers have tendered the $50 million sublimits for losses at the CTC and CCDC locations and contend that the tender exhausts ALL coverage for these locations so that they owe no additional amounts for "Extra Expense and Expediting Expenses" and "Research and Development." Cummins says that the sublimits do not apply to these coverages and the Insurers are still obliged to settle the Expense and R&D losses at the CTC and CCDC locations.

3. Cummins and the Insurers disagree regarding the meaning and application of the deductible provision. The Insurers contend that at least with respect to losses within the CTC or CCDC, a special deductible applies calculated at 5% of "Property Damage Value and Business Interruption Values." The Insurers have calculated the deductible to be about $20 million. Cummins contends the applicable deductible is the general $2.5 million deductible, and that even if the 5% calculation is applicable, the Insurers are using the wrong figures for Property Damage Value and Business Interruption Values.

4. The parties disagree about application of the term "Period of Recovery" for measuring Cummins's business interruption losses. Under the Policy, the Period of Recovery ends at the time that would be required "with the exercise of due diligence and dispatch to rebuild, repair, or replace the property that has been destroyed or damaged," plus the additional time to restore the business to its condition had no loss occurred, commencing with . . . "the date on which repair, replacement or rebuilding of the property that has been damaged is actually completed and the Insured has resumed normal operations." The Insurers contend that the Period of Recovery ended for the CTC on July 31, 2008, and for the CEP, on June 9, 2008.

Cummins disagrees with these end-dates and also contends, contrary to the Insurers' stance, that certain business interruption losses—costs related to test and audit engines—are covered.

Cummins's suit seeks declaratory relief adjudging the Insurers' coverage obligations, damages for breach of contract, and damages for breach of the Insurers' duty of good faith and fair dealing.

### **General Discovery Principle**

Rule 26 of the Federal Rules of Civil Procedure allows parties to obtain discovery of any "nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Though the scope of discovery is broad, the court must limit discovery otherwise allowed where (1) it is unreasonably cumulative or duplicative or can be obtained from a source that is less burdensome or expensive; (2) there already has been ample opportunity to obtain the requested discovery; or (3) the burden or expense to comply with the requested discovery outweighs its likely benefit "considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii).

### **Contested Discovery**

The areas of contested discovery between the parties are broad and varied, and concern interrogatories 1, 2, 3, and 7;[2] and document requests 3, 4, 12, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28 and 29. The court will address each discovery request but not necessarily in numerical order.

---

[2] Cummins's motion also addressed interrogatories 4, 5, 24, and 25, but Cummins has withdrawn its motion for these four interrogatories. Cummins has accepted information supplied by the Insurers in their initial disclosures as sufficient supplementation of the Insurers' initial responses to these interrogatories.

### 1. **Interrogatory 1 – A Contention Interrogatory**

Cummins's interrogatory 1 asks each Insurer to provide the bases for its responses to each allegation of Cummins's complaint that the Insurer did not unequivocally admit. Cummins characterizes this interrogatory as "simple" and "basic," but the court agrees with the Insurers that it is a contention interrogatory too burdensome to answer at this stage of the case before the parties have exchanged all documents, gathered documents from non-parties, and taken depositions. Further, Cummins knows already—in fair detail—the Insurers' positions on coverage and Cummins's Claim. *See, e.g.,* Exhibits D-G to the Insurers' opposition brief (Dkt. 92), which are various communications from the Insurers or their representatives setting forth the Insurers' positions on coverage and adjustment of Cummins's Claim. Cummins's statement that, without answers from the Insurers to interrogatory 1, it does not understand the Insurers' positions sufficiently to conduct discovery about those positions is not credible.

### 2. **Interrogatories 2 and 3 – Cummins's Claim Model**

In about July 2009, Cummins prepared and submitted to the Insurers a Claim Model, which is its comprehensive insurance claim in the form (according to the Insurers) of a 1500-line submission contained on eight CDs. Interrogatories 2 and 3 ask each Insurer to answer, as to each item in the Claim Model, whether the Insurer disagrees at all with the claim and the basis for any disagreement, including whether the disagreement is because the claim is outside the Policy's coverage and, if so, the basis for the coverage position. Cummins contends that the Insurers "have failed to provide any explanation of any position under the Policy or in relation to the facts or applicable law for any aspect of Cummins's insurance claim" other than with respect to the $50 million sublimits and period of recovery. (Dkt. 88 at p. 5). The court finds this assertion hyperbolic and impossible to reconcile with the various Insurer communications cited

above that set forth the Insurers' positions on coverage and adjustment of Cummins's Claim. (Dkt. 92, Exhibits D-G). Further, the fact that interrogatories 2 and 3 could be viewed as 1500 separate interrogatories (one for each line item on the Claim Model) demonstrates the burdensome and inefficient use of these interrogatories to ferret out the parties' coverage and claims disagreements.

According to the Insurers, they have provided to Cummins a document that does respond to each claim item, states whether the claim is agreed or disputed (with reasoning provided), or whether further information is required. On reply, Cummins contends the document is cryptic and, in some places, contains numbers without any explanation. Additional or different discovery may be necessary to facilitate the parties' understanding of this document which purports to respond to each claim item, but the court declines to require the Insurers to start over and create a new document via interrogatory answers that tracks through Cummins's Claim Model line by line.

### 3. Interrogatory 7 – Policy Language Drafting

Interrogatory 7 asks whether each Insurer contends that any language of the Policy was "drafted by someone other than" the Insurer and, if so, to identify that language and the bases for the contention that someone else drafted the language. The Insurers answered that Cummins's agent, Aon, drafted the Policy language and marketed the Policy to each of the Insurers for review and approval. The Insurers also referred Cummins to their underwriting files for responsive documents. Cummins argues that the answer is not responsive because the Insurers have not stated whether any language of the Policy "originated from anyone other than Aon" or is language that the Insurers have used or adopted in policies other than the Policy. Cummins

also contends that it needs supplemental answers so it can identify the persons who, on behalf of the Insurers, "were involved in the drafting of a key provision of the Policy."

Identifying the "drafter" or the "originator" of disputed Policy language may be significant to the resolution of this case. Cummins argues that under Indiana law, which it contends is the applicable law, the drafter or originator is not relevant because ambiguous insurance policies are always construed against the insurer and in favor of coverage even if the policy is a manuscript policy shopped by the insured. Nevertheless, Cummins recognizes that the Insurers may contend that any ambiguous provisions of the Policy must be construed against Cummins as the drafter. To combat that contention, if it arises, Cummins wants the opportunity to discover evidence that any ambiguous provisions are provisions that the insurance industry, or these Insurers, "originated" or "drafted."

The problem with interrogatory 7, however, is that it does not fairly and without undue burden seek the information relevant to the legal issue Cummins has identified. Interrogatory 7 does not identify the "key" provisions at issue in this litigation, but applies to every word in the Policy. The exemplar Policy attached to Cummins's amended complaint is 88 pages long and nothing suggests that every word will need the court's (or a jury's) construction or interpretation. Further, Cummins filed its motion to compel before it received and reviewed the Insurers' underwriting files for the Policy. The Insurers' discovery responses suggest that these files contain responsive information. The court will not require the Insurers to supplement their answers to interrogatory 7 further. If the information and documents available to Cummins do not permit it to trace the origin for the Policy provisions that are actually at issue in this litigation, then Cummins should draft new discovery requests (or take depositions) that are appropriately directed at the terms genuinely at issue in this litigation.

### 4. Document Requests 3 & 22 – Underwriting Manuals;
   Document Requests 12 & 27 – Claims Handling Manuals

Document request 3 seeks "all documents related to" each Insurer's underwriting

manuals and guidelines for the underwriting and issuance of commercial property policies from

2005 to the present. Request 22 has a slightly different spin on underwriting manuals, seeking

all manuals relating to any of the policy language identified in document request 16 (which

identifies, essentially, language common to commercial property policies, and thus is subsumed

within document request 3). Document request 12 seeks each Insurer's claims handling manuals

(and all documents relating to the monitoring and handling of claims) in two categories: (1) all

such materials for commercial property claims for the period January 1, 2003 to the present; and

(2) all such materials that were used by the Insurer in handling Cummins's Claim, including

responding to or stating a coverage position as to Cummins's Claim. Document request 27 asks

for "all documents relating to . . . policies . . . to ensure a consistent interpretation of . . . policy

language." The court (and apparently the parties) construe document request 27 as one for which

the production of underwriting manuals and/or claims manuals would be responsive, and thus is

addressed by resolution of the manuals production dispute.

Cummins argues that underwriting and claims manuals are relevant because they may

reveal whether the Insurer complied with its own guidelines in adjusting the claim at issue (a

matter relevant to a bad faith claim) and may contain information about the proper application of

policy language. Cummins cites cases from around the country that have required production of

underwriting and claims manuals in insurance coverage and bad-faith disputes on these grounds.

*E.g., United States Fire Ins. Co. v. Bunge North Amer. Inc.,* 244 F.R.D. 638, 646 (D. Kan. 2007)

(affirming magistrate judge's order to produce claims manuals, which found manuals could be

probative of insurer's policy interpretation guidelines and coverage positions and relevant to

whether claim properly handled); *Stonewall Ins. Co. v. National Gypsum Co.,* 1988 WL 96159 at

*3-4 (S.D.N.Y. Sept. 6, 1988) (affirming magistrate judge's order to produce claims and

underwriting manuals and guidelines, which found them relevant to interpretation and

application of standard industry-wide terms for asbestos coverage**).** An Indiana case, *Michigan*

*Mut. Ins. Co. v. Sports, Inc.,* 698 N.E.2d 838 (Ind. Ct. App. 1998), recognizes the relevance of an

insurer's claims manual to a bad-faith claim. At trial, the plaintiff's expert's opinion regarding

the insurer's denial of the claim was based in part on the insurer having taken a position

inconsistent with the terms of its claims manual. *See id.* at 838.

The Insurers contend that underwriting and claims manuals are not relevant to coverage

issues because courts cannot go beyond the four corners of the insurance contract in construing

its meaning, and "here, there is no ambiguity. . . ." (Dkt. 92 at p. 19). They argue too that even

if extrinsic evidence of intent could be admissible in this case, underwriting and claims manuals

would reflect only the unilateral intent of the Insurers and thus is irrelevant to ascertaining the

parties' intent. Finally, they assert that claims and underwriting manuals are sensitive,

proprietary information, the sharing of which would place the Insurers at a competitive

disadvantage.

The court is persuaded that Cummins has the better argument here. First, neither

Cummins nor the Insurers have given the court any basis for determining that the Policy is

unambiguous in all respects on which the parties dispute the construction of the language. In

fact, the parties' briefing on Cummins's motion to compel does not specifically identify the

precise Policy language at issue in this case and the parties' positions (at least initial positions)

on the proper construction of the Policy language. Cummins's discovery requests, and motion to

compel, give the impression that nearly every word of the Policy is at issue, while the Insurers

think none is.  Because the court cannot decide on the current record that the Policy is wholly unambiguous, it will not refuse discovery that may tend to lead to admissible evidence regarding the meaning of the Policy.  Second, the court is not persuaded by the cases cited by the Insurers for the proposition that claims and underwriting manuals could lead only to evidence of an Insurer's unilateral intent, and thus would be irrelevant.  Neither *Granite State Ins. Co. v. Degerlia,* 925 F.2d 189 (7th Cir. 1991), *Alfin, Inc. v. Pacific Ins. Co.,* 735 F. Supp. 115 (S.D.N.Y. 1990), *Lubrication and Maintenance, Inc. v. Union Resources Co.,* 522 F. Supp. 1078 (S.D.N.Y. 1981), or *KN Energy, Inc. v. Great Western Sugar Co.,* 698 P.2d 769 (Colo. 1985), decided discovery issues or discussed claims or underwriting manuals.  *Lubrication* and *KN Energy* are not insurance coverage cases.

In *Granite,* the court ruled that even if an insurer's subjective intent indicates its belief that coverage exists, that intent will not override clear and unambiguous language in the policy. 925 F.2d at 193.  The *Alfin* court, which denied summary judgment in an insurance coverage dispute, found that the insured's proffered interpretation of the policy language was reasonable, creating an ambiguity in the contract that permitted the introduction of extrinsic evidence. Although the *Alfin* court declined to consider the testimony of the insurer's underwriters regarding their beliefs of the policy's meaning, that decision was based on a finding that their interpretations were *post hoc* and for purposes of litigation.  735 F. Supp. at 120.  The *Alfin* court may well have decided differently if the extrinsic evidence were underwriting or claims manuals existing at the time the policy was issued.  *Lubrication*, not an insurance coverage case, also notes that contracting parties' intent is governed "by what they wrote, their acts, conduct, and all surrounding circumstances."  522 F. Supp. at 1081.  And *KN Energy* similarly expresses the

general contract principle that extrinsic evidence is permitted where a contract is ambiguous. 698 P.2d at 777.

As Cummins points out, the Indiana Supreme Court looked to "the insurance industry's own interpretation of the contractual language" in holding that a standard pollution exclusion clause was ambiguous. *American States Ins. Co. v. Kiger,* 662 N.E.2d 945, 947-48 (Ind. 1996). *See also Allstate Ins. Co. v. Dana Corp.,* 759 N.E.2d 1049, 1059-60 (Ind. 2001) ("[e]vidence of industry practice is admissible to construe terms of art [in insurance contracts] or ambiguous agreements"). The industry's interpretation may be found in or referenced in claims or underwriting manuals.

The Insurers do not respond at all to Cummins's argument that the underwriting and claims manuals could lead to evidence admissible on its bad faith claim. As to the Insurers' protestation that production of their claims and/or underwriting manuals could place them at a competitive disadvantage, the court finds that these concerns can be addressed through an appropriate protective order.

Although the court finds that underwriting and claims manuals are relevant and discoverable, the court also determines that the scope of Cummins's requests is unduly burdensome. In response to document requests 3, 12, 22, and 27, the Insurers are required to produce only underwriting manuals that were in existence at the time the Policy was underwritten and issued, and are required to produce only claims manuals that were "obtained, used, referred to, or relied upon . . . in considering, handling, addressing, analyzing, responding to or state a coverage position" as to Cummins's Claim or adjusting its claimed losses.

## 5. **Document Requests 4, 18, 24, 25, and 26 – Drafting History Documents**

Document requests 4, 18, 24, 25, and 26 are geared toward discovery of the insurance industry drafting history of policy language identical or similar to language in the Policy.

Request 4 seeks:

> All documents related to any differences between different property forms, including all endorsements, for each type of commercial property insurance policy issued by you during the period January 2003 to the present for any and all language that you contend applies to Cummins' Claim and/or that is the same or similar to any of the language referenced in Request No. 16.

Request 18 seeks:

> All documents related to any standard policy form issued by you and/or any of the Insurers from 1995 to the present that contains any of the policy language set forth in Request No. 16.

Request 24 seeks:

> All documents relating to the drafting of any of the policy language identified in Request No. 16 including, but not limited to, all drafts, related endorsements, related policy forms, correspondence, memoranda, and notes at any time from 1995 to the present.

Request 25 seeks:

> All documents relating to any revisions, modifications, changes, and/or different versions of any of the policy language identified in Request No. 16, including, but not limited to, all drafts, related endorsements, related policy forms, correspondence, memoranda, and notes at any time from 1995 to the present.

Request 26 seeks:

> All documents produced, obtained, used, referred to, leading to, or relied upon by you or any of the Insurers in adding or making any suggested changes in any of the wording of any of the policy language referenced in Request No. 16 in any commercial property policies issued by any of the Insurers after the issuance to Cummins of the Policy, and all documents relating to the reasons for those changes.

Cummins contends that drafting history could lead to the discovery of evidence admissible on the question whether any language in the Policy is ambiguous in the first place

and, if so, on the meaning of the language. The Insurers argue the discovery is not relevant in the context of this case because it was Cummins and not the Insurers who drafted the Policy and shopped the Policy to the Insurers to provide coverage as requested by Cummins. Cummins responds that even though this case involves a manuscript policy marketed to the Insurers by Cummins's agent, the language of the Policy is standard insurance industry language originating with the insurance industry. The court agrees with Cummins that it is reasonable to assume that the Policy language was not created out of whole cloth by Cummins or its agent, Aon, but has its genesis in standard insurance policies using language with which the Insurers were familiar (and about which the Insurers were thus able to assess their risk). The court also agrees with Cummins that drafting history can be relevant to coverage. But the court finds that Cummins's requests are unduly burdensome and must be trimmed. Because Cummins and the Insurers have taken "all or nothing" approaches to discovery, neither has provided the court with suggestions for paring down any of these discovery requests.

The court orders that in response to document requests 4, 18, 24, 25, and 26, the Insurers shall produce at this time only their standard form commercial property insurance policies including endorsements (with particular attention to endorsements similar to Endorsement No. 10), issued by them at any time from 2000 to 2010. The court will consider allowing Cummins discovery of additional drafting history documents if Cummins points to material language changes for *key* Policy language, provides convincing argument that additional discovery is necessary for the prosecution of its case, and explains why information and documents in hand (and to be produced) are insufficient. Because the Policy is a manuscript policy shopped by Cummins's agent, Cummins presumably already knows (or could find out) from Aon the genesis of key language in the Policy and insurance industry history regarding the language. Before the

13

court will burden the discovery process with the wide-range of drafting history documents that Cummins has sought from 13 separate insurance companies, Cummins must do more than rely on general notions that drafting history can be relevant to a coverage dispute. *See Alfin, Inc. v. Pacific Ins. Co.,* 735 F. Supp. 115, 117, 121 (S.D.N.Y. 1990) (Insurer's change in language of form endorsement regarding securities coverage admissible in determining whether original language was ambiguous and the meaning of the original language).

### 6. Document Request 16 – Interpretation of Policy Language
### <u>Document Requests 17, 19, 20, 21, and 23 – Interpretation of Policy Language</u>

Cummins's document request 16 is comprehensive, and seeks "all" documents related to any interpretation, construction, or position taken by an Insurer since 1995 regarding certain identified language in the Policy or "substantially similar language." Document requests 17, 19, 20, 21, and 23 seek information that is subsumed within document request 16.

Policy language about which Cummins seeks "all" documents includes "any and all language relating to the meaning of" the words or phrases "location," "property," "claim," "acceptance of Proof of Loss," "research and development," and "business interruption" (to name a few). These terms, or similar language, likely appear in all commercial property casualty insurance policies. Thus, as written, document request 16 requires the 13 defendant insurance companies to review, and produce, nearly every single commercial property claim file they have covering the last 15 years. And to the extent that the Insurers keep documents related to claims litigation (requests 19, 20, and 23) or policy interpretation generally (requests 17 and 21) in files other than claims files, the Insurers would be required to review every one of those documents covering the last 15 years. Though the stakes in this litigation are high, the court cannot conceive of an insurance coverage dispute that reasonably requires perusal of nearly every document an Insurer has relating to coverage provided under its policies.

Even if Cummins's document requests were limited to insurance claims involving floods, the Insurers have provided evidence that the burden to comply would be enormous and undue. The Insurers submitted an affidavit from a senior claims examiner with defendant Lexington Insurance Company who testified regarding the manner in which Lexington maintains its claims records and the effort required if Lexington were to search solely claims files regarding floods. For Lexington, a computer search showed that over 30,000 claims exist from January 1, 1995 to the present that potentially involve flood or water. These were identified through computer searches of two claims codes and a catastrophe code used for flood claims. (*See* Dkt. 92-3).

Cummins faults the Insurers for not providing an affidavit from each insurance company regarding the burden that would be imposed on it if it were required to search every claim file for the last 15 years, or even only those involving a flood. The court does not see it the same way. These discovery requests are obviously overbroad, and the court views the affidavit of the claims examiner for Lexington as a reasonable exemplar of the burdens that each of the defendants would face if required to review every claim file, or every flood claim file. It is Cummins that has not adequately addressed the overbreadth of its requests and, contrary to Cummins's characterization, the requests are not "tailored" to the key issues in this case. (*See* Dkt. 88 at p.12).

The case law indicates that in some coverage litigation, the courts have struggled to devise a documents search process that balances an insured's right to discover information that could lead to admissible evidence regarding coverage or ambiguities in policy language (particularly in high-stakes coverage litigation like this case) against the burdens on insurers to search their claims files. *E.g., Zurich American Ins. Co. v. Ace American Reinsurance Co.,* 2006

WL 3771090 at *2 (S.D.N.Y. Dec. 22, 2006) (ordering parties to devise protocol for identifying a sampling of claims files).

In many cases, the courts have required insurers to produce a sampling of claims files related to the subject peril—usually the 10 earliest claims files and 10 latest claims files in a range of years—as sufficient to provide information regarding the insurers' actual claims interpretation and claims handling practices for its potential to lead to admissible evidence regarding policy ambiguity and/or policy coverage interpretation. *See, e.g., Owens-Brockway Glass Container, Inc. v. Seaboard Surety Co.,* 1992 WL 696961 at *3 (E.D. Cal., May 27, 1992) (ordering production of "earliest and latest" ten files for type of claim at issue, as relevant to show course of dealing, understanding of policy language, and whether the policy language is susceptible of meaning urged by insured); *Rhone-Poulenc Rorer, Inc. v. Home Indemnity Co.,* 1991 WL 78200 at *2-3 (E.D. Pa. May 7, 1991) (ordering production of claims files from four particular, similarly-situated insureds); *National Union Fire Ins. Co. v. Stauffer Chemical Co.,* 558 A.2d 1091, 1096 (Del. Super. Ct. 1989) (ordering production of "ten earliest and ten most recent" claim files for similar pollution claims); *Stonewall Ins. Co. v. National Gypsum Co.,* 1988 WL 96159 at *4 (S.D.N.Y. Sept. 6, 1988) (affirming magistrate judge's order requiring insurers to produce ten earliest and ten most recent claims files regarding lead paint coverage claims).

As already noted, Cummins and the Insurers have taken all-or-nothing opposite approaches to the discovery requested in document requests 16, 17, 19, 20, 21, and 23, and thus neither has assisted the court with devising a sampling method that makes sense in this case. Because of the high stakes in this litigation, the fact that "high hazard flood zone" coverage is central to this litigation (including with respect to the sublimits, coverage for extra expense and

expediting expenses and research and development, and the proper deductible), and because the Insurers' treatment of similar flood claims could lead to evidence admissible on the coverage issues, the court finds it appropriate to allow some discovery of other claims files.

The court orders each defendant Insurer to identify, and produce, 20 claims files for which a claim in excess of $1 million was made in the last 10 years for losses due to a flood.[3] Although the court is permitting the Insurers to "pick" the claims files it will produce, it expects that the aggregate selection for the 13 defendant Insurers ultimately will result in a random sampling; spending time trying to "cherry-pick" is a significant time and expense burden. Further, the methods an Insurer used to identify its 20 claims files would be a proper subject of discovery.   To protect confidential information of their other insureds, the Insurers may redact from the claims files all identifying and sensitive commercial information of their other insureds. If a protective order from other litigation affects the production of any of the 20 claims files, the court will address the production of those claims files on a case-by-case basis.[4]  Further, if a claim file indicates that litigation or arbitration (or other dispute resolution process, such as state insurance administrative complaint resolution) was involved in the resolution of the claim, the Insurer shall search for and produce its non-privileged documents relating to that dispute resolution process.

These tasks will satisfy the Insurers' obligations for document requests 16, 17, 19, 20, 21, and 23.

---

[3]      Based on the affidavit of the claims examiner for Lexington Insurance Company, the court anticipates that the Insurers have computerized record capabilities allowing them to identify large claims for catastrophes involving floods.

[4]      The court anticipates that it will require further efforts to allow the production of the claim file consistent with compliance with the protective order.

### 7. **Document Request 28 -- Reinsurance Information**

Cummins's document request 28 seeks all communications relating to Cummins's Claim between the Insurers and their reinsurers, including reinsurance contracts, agreements, or treaties. Cummins contends that communications between the Insurers and their reinsurers (other insurance companies to which the Insurers may have ceded all or part of their risk under the Policy) may reveal the Insurers' analysis of coverage (and thus lead to the discovery of information relevant to the meaning of contested Policy language) or shed light on the Insurers' handling of Cummins's Claim as it relates to Cummins's bad faith claim. Cummins also argues that reinsurance contracts, agreements, or treaties fall within Rule 26(a)(1)(A)(iv), which requires production of "any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment. . . ."

The court finds that even if reinsurance contracts theoretically fall within Rule 26(a)(1)(A)(iv), their production is not required here. First, their production in this case does not fit the purposes the rule promotes. The purpose of Rule 26's requirement to disclose insurance policies that may provide coverage to satisfy a judgment is to allow parties to assess realistically collection of a judgment and tailor their litigation and settlement strategies in light of that information. *See* Advisory Notes to Rule 26 (1966 Amendment, Subdivision (b)(2)-Insurance Policies) The Insurers contend that there is no issue here whether the Insurers could satisfy a judgment in Cummins's favor. Cummins does not disagree, and relies only on Rule 26's "automatic" insurance policy disclosure rule to advocate production of reinsurance treaties and contracts. Second, the Insurers' contractual relationships with reinsurers are sensitive business matters that the Insurers naturally may not wish even to share with each other. Third, the

contracts themselves are not relevant to coverage or bad faith issues. For these reasons, the burden of producing the contracts outweighs any benefit. *See* Rule 26(b)(2)(C)(iii).

Communications between the Insurers and their reinsurers regarding the Claim are different. They may indeed reveal the Insurers' views on coverage that may lead to evidence admissible on both Cummins's breach of contract claim and bad faith claim. *See, e.g., Stonewall Ins. Co. v. National Gypsum Co.,* 1988 WL 96159 at *5 (S.D.N.Y. Sept. 6, 1988) (affirming magistrate judge's order to produce communications between insurer and reinsurers, noting plaintiff's argument that the documents could reflect insurer's understanding of underlying claims and whether claims are covered); *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co.,* 623 A.2d 1099, 1108 (Del. Super. Ct. 1991) ("defendants' communications with their reinsurers may provide or lead to the discovery of potentially admissible extrinsic evidence of a meeting of the minds concerning the language of the policies at issue"). Though the Insurers correctly point out that an unambiguous insurance policy is construed within its four corners, there has been no determination whether the Policy is unambiguous with respect to all contested terms, whether extrinsic evidence may be admissible to show that terms are ambiguous, and whether extrinsic evidence may be admissible to interpret language found to be ambiguous. Communications between the Insurers and their reinsurers (or anyone else for that matter) about Cummins's Claim may lead to the discovery of evidence admissible to construe the Policy, and there has been no showing that searching for and producing these communications is an unduly burdensome endeavor that outweighs the likely benefit of the discovery.

### 8. <u>Document Request 29 – Loss Reserves</u>

Cummins's document request 29 seeks "[a]ll documents related to the setting of, or any decision not to set, a reserve or loss reserve for the Claim." Cummins's main justification for

seeking reserve information is its alleged relevance to Cummins's bad faith claim because, it contends, reserve information can "shed light on the insurer's state of mind behind its decision to deny coverage." (Dkt. 88 at p. 25). Cummins also argues that, apart from bad faith, reserve information may provide information about an Insurer's position on the existence and extent of coverage. The Insurers argue that because the setting of reserves involves compliance with regulatory requirements that may have nothing to do with the specifics of any particular claim and because reserves, even where claim specific, are purely precautionary estimates that do not normally entail a thorough evaluation of the factual and legal merits of the claim, its relevance is too tenuous to require production. They also say that reserve information could be used unfairly to confuse a jury, and may reflect attorney opinion work product that is protected from disclosure. These latter points are insufficient in themselves to defeat production. Although a Fed. R. Evid. 403 analysis may counsel keeping reserve information from a jury because of its low relevance and potential to confuse the issues or mislead, those considerations do not govern whether the information should be discovered in the first place for its potential to lead to the discovery of admissible evidence. As to work product or attorney-client privilege concerns, objections to production on privilege grounds normally must be made on a document-by-document basis; there is no showing that for all defendant Insurers, "all" documents relating to the setting of loss reserves are protected from disclosure on attorney opinion work product or attorney-client privilege grounds.

The court agrees with the Insurers that the connection between the requested loss reserve information and the issues in this case is too attenuated to require the Insurers to search for and produce every document that relates to the setting (or not setting) of loss reserves for Cummins's Claim. Because of the business risk and regulatory compliance considerations involved in the

setting of loss reserves, loss reserves information are not synonymous with, and may not be particularly probative of, an Insurer's opinion on the true value of a particular claim or on coverage. *See, e.g., Silva v. Basin Western, Inc.,* 47 P.3d 1184, 1190-1192 (Colo. 2002) (discussion of cases across the country regarding discoverability of loss reserve information in both the first-party and third-party insurance context). The court is also not convinced that Cummins needs all documents relating to the setting of loss reserves to assist in proof of its bad faith claim, or even that a loss reserve number different (even drastically different) from a claims adjustment number is probative of bad faith. The Insurers should not be burdened with finding and producing every loss reserve document when other and better sources of information about the Insurers' handling of Cummins's Claim exists.

That said, the Insurers are not permitted to redact loss reserves information from documents that the Insurers otherwise have produced or will produce. For example, the Insurers have produced reports provided to them by Crawford & Co., a company they hired to assist in adjusting Cummins's Claim, but have redacted numerous portions of those reports because they discuss "Reserves." (*See* Dkt. 116-20). Redactions from documents merely because they discuss or relate to Reserves are not appropriate. Discussions about coverage in connection with loss reserves are not wholly irrelevant to the claims and defenses in this case, are not necessarily privileged, and to the extent that the information is somehow confidential or proprietary, its production can be made subject to an appropriate protective order. Further, the court is capable of curtailing use of reserve information to unfairly confuse issues in this case. If the Insurers have an attorney-client or work product privilege objection to producing particular loss reserve information contained in documents that are subject to production, they must make that objection on a document-by-document basis.

## Conclusion

Cummins's motion to compel (Dkt. 87) is GRANTED in part and DENIED in part, on the terms set forth in this entry. The defendants' request for oral argument (Dkt. 93) is DENIED as moot.

The motion to compel is DENIED as to interrogatories 1, 2, 3, and 7.

For document requests 3, 12, 22, and 27, the Insurers shall produce underwriting manuals that were in existence at the time the Policy was underwritten and issued, and claims manuals that were "obtained, used, referred to, or relied upon . . . in considering, handling, addressing, analyzing, responding to, or stating a coverage position" for Cummins's Claim.

For document requests 4, 18, 24, 25, and 26, the Insurers shall produce their standard form commercial property insurance policies including endorsements issued by them at any time between 2000 to 2010.

For document requests 16, 17, 19, 20, 21, and 23, each Insurer shall produce the 20 claims files and any associated dispute resolution documents as described in this entry.

For document request 28, the motion to compel is DENIED as to the production of reinsurance contracts, agreements, or treaties. However, the Insurers shall produce communications between the Insurers and their reinsurers relating to Cummins's Claim.

For document request 29, the motion to compel is DENIED. However, the Insurers are not permitted to redact loss reserves information from documents that the Insurers otherwise have produced or will produce.

The Insurers shall produce the above-described documents within 30 days of the date of this order.

So ORDERED.

Date: 01/14/2011

*Debra McVicker Lynch*
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

Bryce H. Bennett Jr.
RILEY BENNETT & EGLOFF LLP
bbennett@rbelaw.com

Andrew J. Detherage
BARNES & THORNBURG LLP
andy.detherage@btlaw.com

Charles P. Edwards
BARNES & THORNBURG LLP
charles.edwards@btlaw.com

Kenneth W. Erickson
ROPES & GRAY, LLP
kenneth.erickson@ropesgray.com

David E. Heiss
FISHER KANARIS P.C.
dheiss@fisherkanaris.com

Peter Emanuel Kanaris
FISHER KANARIS PC
pkanaris@fisherkanaris.com

Eric D. Stubenvoll
FISHER KANARIS, P.C.
estubenvoll@fisherkanaris.com